No. 22-3127

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

MAIRA ORTIZ,

Plaintiff-Appellant,

vs.

BANK OF LABOR,

Defendant-Appellee

_____

Appeal from the United States District Court
for the District of Kansas

The Honorable Julie A. Robinson
District Court No. 21-2316-JAR

_____

APPELLANT'S OPENING BRIEF

_____

ALAN V. JOHNSON, KS. #9992                    ORAL ARGUMENT
SLOAN, EISENBARTH, GLASSMAN,                  NOT REQUESTED
  McENTIRE & JARBOE, L.L.C.
534 S. Kansas Avenue, Suite 1000
TOPEKA, KS  66603
PHONE:     785/357-6311
FAX:       785/357-0152

# TABLE OF CONTENTS

**STATEMENT OF JURISDICTION** ................................................................1

**STATEMENT OF ISSUES** .........................................................................2

**STATEMENT OF THE CASE** .....................................................................2

    **A.**    **Ms. Ortiz's Employment At The Bank's Shawnee Branch** ........................................................2

    **B.**    **The Bank's Refusal To Allow Ms. Ortiz To Use The Bathroom In The McDonald's Next Door To The Shawnee Branch** ................................................3

    **C.**    **The Bank's Refusal To Allow Ms. Ortiz To Use A Chair While Not Helping Customers** ...............................4

    **D.**    **The Bank's Termination of Ms. Ortiz From Her Employment** ..........................................5

    **E.**    **The District Court's Decision** ............................. 12

**ARGUMENTS AND AUTHORITIES** ........................................... 14

    Crow v. ADT Sec. Services, Inc.,
    649 F.3d 1189, 1194 (10th Cir. 2011) ............................... 14

    Garrett v. Hewlett-Packard Company,
    305 F.3d 1210, 1216 (10th Cir. 2002) ............................... 14

    Gullickson v. Southwest Airlines Pilots' Ass'n,
    87 F.3d 1176, 1183 (10th Cir. 1996) ................................ 14

    Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242, 249 (1986) ................................................ 14

    Reeves v. Sanderson Plumbing Prod., Inc.,
    530 U.S. 133, 150 (2000)... .............................................. 14

    Jeffries v. State of Kan.,
    147 F.3d 1220, 1228 (10th Cir. 1998) ............................... 14

i

I.    **A REASONABLE JURY, FACED WITH THE EVIDENCE PRESENTED, COULD RETURN A VERDICT IN FAVOR OF MS. ORTIZ ON HER CLAIM THAT THE BANK DISCRIMINATED AGAINST HER BY REFUSING TO ALLOW HER TO USE THE BATHROOM IN THE MCDONALD'S NEXT DOOR TO THE BANK** ............................................................................... 15

Kendrick v. Penske Transp. Servs.,
220 F.3d at 1220, 1225 (10th Cir. 2000) ......................... 15, 21, 22, 24

McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973). ........................................................... 15

Orr v. City of Albuquerque,
417 F .3d 1144, 1149 (10th Cir. 2005). .............................. 15

A.    **The McDonald Douglas Burden-Shifting Framework** ............................................................... 15

Bird v. Regents of N.W. State Univ.,
619 Fed Appx. 733, 741 (10th Cir. 2015) ........................... 16

EEOC v. PVNF, L.L.C.,
487 F .3d 790, 800 (10th Cir. 2007). ................................... 16

B.    **The Tenth Circuit's Liberal Definition of "Adverse Employment Actions"** ........................... 17

Sanchez v. Denver Schools
F.3d 7527 (10th Cir. 1998) .................................... 17, 18, 19

Braxton v. Nortek Air Solutions, L.L.C.,
796 Fed. Appx. 600. 604 (10th Cir. 2019) ................... 17, 19

EEOC v. C.R. England, Inc.,
644 F.3d 1028, 1040 (10th Cir. 2007) ................................ 17

Annett v, University of Kansas,
371 F.3d 1233, 1239 (10th Cir. 2004) ......................... 18, 19

**II.    A REASONABLE JURY, FACED WITH THE EVIDENCE PRESENTED, COULD RETURN A VERDICT IN FAVOR OF MS. ORTIZ ON HER CLAIM THAT THE BANK DISCRIMINATED AGAINST HER BY REFUSING TO ALLOW HER TO USE A CHAIR WHILE NOT HELPING CUSTOMERS** ................................ 18

    **A.    The McDonald Douglas Burden-Shifting Framework** ............................................................. 18

    **B.    The Unique Factors Relevant To The Present Case** ................................................. 18

**III.    A REASONABLE JURY, FACED WITH THE EVIDENCE PRESENTED, COULD RETURN A VERDICT IN FAVOR OF MS. ORTIZ ON HER CLAIM THAT THE BANK DISCRIMINATED AGAINST HER BY TERMINATING HER EMPLOYMENT** .............................................................. 19

    **A.    The McDonald Douglas Burden-Shifting Framework** ............................................................. 20

    **B.    Evidence of Pretext** ................................................. 21

    Lobato v. New Mexico Ev't Dep't,
    733 F .3d 1283, 1289 (10th Cir. 2013) ............................ 21

    Zamora v. Elite Logistics, Inc.,
    478 F.3d 1160, 1166 .................................................... 21

**(1.)    Preferential Treatment of A Similarly-Situated Employee** ....................................................... 21

    Barlow v. C.R. Eng., Inc.,
    703 F.3d 497, 505 (10th Cir. 2012) ................................ 21

    Macon v. UPS,
    743 F.3d 708, 718 (10th Cir. 2014) ................................ 22

    Riggs v. AirTran Airways, Inc.,
    497 F.3d 1108, 1117 (10th Cir. 2007) ............................ 22

**(2.)    Inconsistencies, Incoherencies, or Contradictions In the Bank's Explanation** ............................................ 23

Lounds v. Lincare, Inc.,
812 F.3d 1208, 1234 (10th Cir. 2015) .............................................. 24

**(3.)    False Explanation by the Bank** ...................................... 24

Cole v. Ruidoso Mun. Sch.,
43 F.3d 1373, 1380-81 (10th Cir. 1994) ........................................... 24

**(4.)    Summary** ............................................................... 25

Randle v. City of Aurora,
69 F.3d 441 (10th Cir. 1995) ........................................................... 25

**CONCLUSION** ........................................................................ 25

**CERTIFICATE OF COMPLIANCE WITH RULE 32** ................................. 26

**CERTIFICATE OF DIGITAL SUBMISSION** ........................................... 26

**ORAL ARGUMENT** ................................................................. 26

**CERTIFICATE OF SERVICE** ........................................................ 27

**APPENDIX:  Memorandum and Order Filed on June 09, 2022**

## **PRIOR APPEALS**

There are no prior or related appeals to this action.

## STATEMENT OF JURISDICTION

This is an employment discrimination case arising under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C., § 2000e, et seq., and under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et. seq. The plaintiff, Maira Ortiz, was employed as a Universal Banker 1 by the defendant, the Bank of Labor ("the Bank"). Ms. Ortiz was pregnant at the time of the incidents giving rise to this lawsuit. (Aplt. App. at 26-34)

Ms. Ortiz contended that the Bank discriminated against her because of her sex and pregnancy and/or her disability (pregnancy): (1) by refusing to allow her to use the bathroom in the McDonald's next door to the Bank: (2) by refusing to allow her to use a chair while not helping customers; and (3) by terminating her from her employment. (Aplt. App. at 26-34)

The Bank filed a motion for summary judgment as to all of Ms. Ortiz's claims. (Aplt. App. at 41-92) On June 9, 2022, the district court filed a memorandum and order granting the Bank's motion for summary judgment as to all of Ms. Ortiz's claims. (Aplt. App. at 152-170) On the same day, final judgment was entered in favor of the bank. (Aplt. App. at 171-172)

On July 8, 2022, Ms. Ortiz filled a notice of appeal pursuant to Fed. Rule App. Pro. 4(a)(1). (Aplt. App. at 173) The court of appeals has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. This appeal only involves Ms. Ortiz's claims of discrimination under Title VII, based on her sex and pregnancy.

## STATEMENT OF ISSUES

1.      Could a reasonable jury, faced with the evidence presented, returned a verdict in favor of Ms. Ortiz on her claim that the Bank discriminated against her by refusing to allow her to use the bathroom in the McDonald's next door to the Bank?

2.      Could a reasonable jury, faced with the evidence presented, return a verdict in favor of Ms. Ortiz on her claim that the Bank discriminated against her by refusing to allow her to use a chair while not helping customers?

3.      Could a reasonable jury, faced with the evidence presented, return a verdict in favor of Ms. Ortiz on her claim that the Bank discriminated against her by terminating her from her employment?

## STATEMENT OF THE CASE

### A. Ms. Ortiz's Employment At The Bank's Shawnee Branch

Ms. Ortiz is a Hispanic female, and she was hired by the Bank in May of 2018 as a Universal Banker 1 Bilingual. (Aplt. App. at 27) The Bank is a Kansas-based corporation originally founded as a labor community bank which maintains branch locations throughout the State of Kansas and in the District of Columbia. (Aplt. App. at 69)

For the time period relevant to this lawsuit, Ms. Ortiz worked at the Bank's branch on Shawnee Drive in Kansas ("the Shawnee Branch"). (Aplt. App. at 27) The Shawnee Branch is a small location which shares a building and bathrooms with a 7-Eleven gas station. (Aplt. App. at 69)

2

Ms. Ortiz's direct supervisor at the Shawnee Branch was Charlotte Hayes, the Branch Supervisor. Ms. Ortiz's next level supervisor was Mary Moulin, the Branch Manager. (Aplt. App. at 74-75) Ms. Hayes was not pregnant at anytime during her employment with the bank. (Aplt. App. at 135)

### B. The Bank's Refusal To Allow Ms. Ortiz To Use The Bathroom In The McDonald's Next Door To The Shawnee Branch

The Shawnee Branch is a separate facility within the building which also contains the 7-Eleven gas station. The Shawnee Branch facility is entirely walled in, and it has doors which can be locked. Therefore, if an employee of the Shawnee Branch uses a bathroom in the 7-Eleven gas station, the employee has to leave the Shawnee Branch facility. (Aplt. App. at 120)

In June of 2019, Ms. Ortiz found out that she was pregnant. She told Ms. Hayes that she was pregnant in September of 2019, when she was about five months along in her pregnancy. (Aplt. App. at 80)

Prior to October of 2019, Ms. Ortiz was allowed to leave the Shawnee Branch when there were only two employees in the Branch, and use the bathroom in the McDonalds's next door to the Branch. (Aplt. App. at 120) Ms. Ortiz preferred to use the bathroom in the McDonald's because one of the bathrooms in the gas station was shut down, and the other bathroom "was always dirty, messy." (Aplt. App. at 120)

Ms. Ortiz went on vacation during the first part of October of 2019. When she returned from her vacation, she was told by Ms. Hayes that she could not

use the McDonald's bathroom until Ms. Hayes, or another teller, started their shift because "the bank requires two people to be <u>in the bank</u> at any given time when it's open." (Aplt. App. at 81. Emphasis added.) Ms. Ortiz testified that not being able to use the McDonald's bathroom adversely affected her because she was pregnant. She explained:

> And I came back [from vacation] and I was told that I wasn't allowed to go to the restroom to McDonald's no more.
>
> And when they brought that up, my first reaction was <u>how am I going to be able not to go to the restroom, especially on my pregnancy?</u> I am getting to the point that I <u>need to go often to the bathroom.</u>

(Aplt. App. at 80. Emphasis added.)

### C. <u>The Bank's Refusal To Allow Ms. Ortiz To Use A Chair While Not Helping Customers</u>

When Ms. Ortiz returned from her vacation in October of 2019, her feet started getting swollen, so she started sitting on a folding chair when she was not helping a customer. The folding chair was small enough to fit in her cubicle. (Aplt. App. at 81, 121)

However, shortly after Ms. Ortiz began using the folding chair to sit down, Ms. Hayes took the chair away from her three different times. Ms. Hayes told Ms. Ortiz that it was a new rule or policy that she could only use one of the two chairs in the drive-through window area. (Aplt. App. at 81, 124-129)

Ms. Ortiz specifically told Ms. Hayes that the chairs in the drive-through were too big to fit in her cubicle, and that she could not carry the chairs to her

cubicle. However, Ms. Hayes ignored Ms. Ortiz's statement, and took no further action. (Aplt. App. at 125, 131-133)

### D. The Bank's Termination of Ms. Ortiz From Her Employment

In support of its security measures, the Bank implements and maintains policies related to vault security, including the Teller Difference Guidelines, the Bank Vault and Teller Cash Procedures, and the Code of Ethics. As they relate to this case, the Teller Difference Guidelines provide:

DIFFERENCES

All differences regardless of the amount will be recorded on the teller's over/short record. Teller differences must be reported to a directed supervisor or manager immediately. Teller differences of $50 or more also require a dual control audit to be completed ….

….

DISMISSAL

In addition to the Balancing Standards and Probation guidelines listed above, a teller may be terminated for any of the reasons listed below:

- Force balancing of Bank Records, teller drawers, cash vaults, etc. in any way to avoid a cash difference ...

(Aplt. App. at 82, 84)

The Bank Vault and Teller Cash Procedures provide the following guidance regarding vault cash balancing:

- Every precaution is to be taken to avoid a situation that causes the cash vault to be out of balance. The

> use of dual control in every transaction that involves vault cash should help accomplish that goal. If a vault is found to be out of balance, the branch management team should follow the steps outlined in the Teller Difference Procedures. After balancing is complete, all tickets will be scanned with teller work.

(Aplt. App. at 90)

These procedures also address how tellers are to buy cash from the vault:

- The teller will prepare a Cash In ticket for the amount of cash needed, recording the denomination and amount of currency/coin requested on the Cash In ticket.
- The Vault Teller upon receiving the Cash In ticket will fill the cash order from the teller, utilizing the teller for the dual control process.
- The Vault Teller will prepare the vault Cash Out ticket for the amount of the sale. The tickets will be initialed by both parties and placed and balancing is complete.

(Aplt. App. at 89)

The Code of Ethics contains the following statement:

> Violations of the Code of Ethics could lead to disciplinary action, including termination.
> ….
>
> Examples of inappropriate conduct are listed below (this list is not all inclusive):
> ….
>
> - Force Balancing Bank records, teller drawers, cash vaults, etc.…
>
> - Making or causing false entries to the books or records of the Bank.

(Aplt. App. at 92. Emphasis in original.)

6

In order to ensure that the Bank has an accurate count of cash in its vaults and teller drawers, the Bank has vault-balancing and dual-control procedures. (Aplt. App. at 70) As part of the Bank's dual-control procedures, at the beginning and end of each shift, two employees are expected to count the cash in the vault of each branch and confirm that the amount of cash listed in the vault matches the amount of cash recorded on the written vault log and on the Bank's internal online banking system. (Aplt. App. at 75-76)

One Bank employee is required to call out the amount of cash in the vault and the second employee should document the amount on the written vault log. The vault log is then checked against the amount of cash listed in the Bank's Internal Banking System. If the amount of cash listed on the written vault log matches the amount listed on the Bank's internal online banking system, the vault is balanced. (Aplt. App. at 75-76) When tellers take cash from the vault to fill their drawers, they are expected to write a ticket documenting the amount of cash withdrawn from the vault. (Aplt. App. at 70)

Ms. Ortiz was aware of the Bank's policies, including those governing force balancing and cash differences, and she understood that she was expected to comply with these policies. (Aplt. App. at 27) "Force balancing" is the act of modifying a Bank record, such as a vault log or teller log, to avoid a cash difference. (Aplt. App. at 74) However, Ms. Moulin testified that "force balancing" is an intentional act, "almost like theft". She explained:

Q.    In your view or opinion, is force balancing an intentional act, or can you force balance things by mistake?

A.    In my opinion only forced balancing is an intentional act.

....

Q.    And why is [force balancing] grounds for dismissal?

....

A.    <u>It's almost like theft.</u>

Q.    What do you mean it is almost like theft?

A.    Well, … If I'm balancing the vault and I want to make it balance because I've pocketed some money, I am going to change those records. And that's how the bank looks at it. If you're changing your records to force it to balance, what did you do with the money that you changed your records for?

(Aplt. App. at 136-137)

A "cash difference" occurs when the amount of cash in a drawer or vault does not match the amount recorded on the drawer or vault log. A cash difference can also occur when the amount of cash recorded on a vault log does not match the amount of cash recorded on the Bank's online system. When a Bank employee becomes aware of a cash difference while counting the vault, they are expected to notify their supervisor of the cash difference and recount the vault. (Aplt. App. at 74.76)

As a Universal Banker 1, one of Ms. Ortiz's job responsibilities was to count the cash in the Bank vault under the Bank's dual-control process. After

counting the cash in the vault under the dual-control process, Ms. Ortiz was then expected to sign off on the amount of cash listed in the Bank's internal online banking system. (Aplt. App. at 75-76)

On November 1, 2019, Ms. Ortiz and Ms. Hayes were working a shift together at the Shawnee Drive branch. Ms. Hayes purchased $25.00 in pennies from the vault from her drawer, but forgot to write a ticket. (Aplt. App. at 28, 71) Ms. Ortiz counted the cash in the vault with a co-worker at the end of her shift. Ms. Ortiz found a $25.00 cash difference between the amount in the vault and the amount listed on the Bank's internal online banking system. (Aplt. App. at 28, 77)

Ms. Ortiz, who was standing about twenty feet away from Ms. Hayes' desk, then asked if anybody had tickets from the vault. The only people who responded to her question were the tellers, who each said "no." Ms. Hayes looked up and Ms. Ortiz stated that there was a $25 discrepancy. Ms. Hayes looked at Ms. Ortiz  but did not move from her desk or respond. (Aplt. App. at 130-131)

After identifying the cash difference. Ms. Ortiz whited-out the original cash amount on the vault log and entered another number which was $25.00 less than the original amount. She did not recount the vault. (Aplt. App. at 28, 77) Ms. Ortiz admitted during her deposition that her conduct amounted to modifying a bank record to balance the vault log. Ms. Ortiz further understood that force balancing was a terminable offense. (Aplt. App. at 27, 78, 79)

Late in the day on November 1, 2019, Ms. Moulin was advised by Ms. Hayes that when Ms. Hayes got ready to balance the vault, the vault was out of balance by $25.00. Ms. Hayes explained that she forgot to make a cash-out ticket from the vault for $25.00, which caused the vault, and her teller drawer, to be out of balance. Ms. Hayes further explained that once she made out the cash-in and cash-out tickets for $25.00, both the vault and her teller drawer were in balance. (Aplt. App. at 138-140)

On the following Monday, November 4, 2019, Ms. Moulin and Ms. Hayes requested Ms. Ortiz to meet with them to discuss the incident which had occurred on November 1. During this meeting, Ms. Hayes told Ms. Ortiz that Ms. Hayes had made a mistake, and that there was no money missing. (Aplt. App. at 144-145)

During the meeting on November 4, 2019, Ms. Ortiz stated that she did not intentionally force balance the vault. Ms. Ortiz further stated that she had "pregnancy brain," and couldn't remember things. (Aplt. App. at 144-145)

Following the meeting on November 4, 2019, Ms. Ortiz continued working for the bank, and being in charge of the vault. During her deposition, Ms. Moulin was examined about this fact, and she testified as follows:

> Q.    If force balancing a vault log was such a serious offense, why was Maira allowed to continue to work from November 1st to November 18th?
>
> A.     I can't answer that. I don't know.

> Q.    Whose decision would that have been to … either suspend her from her duties or prevent her from performing those duties?

> A.    Mary Kearns.

(Aplt. App. at 147)

On November 16, 2019, Ms. Ortiz sent an email to Ms. Moulin, Mary Kearns, and Vicki Carey. This email stated in relevant part:

> I was at lunch and I wasn't present and I didn't have knowledge of Charlotte going to get the box of pennies from the vault. She didn't follow the vault/teller procedures on this day. If she would've I would've had a ticket from her teller # and this could've been avoided.

> Charlotte did not take every precaution to avoid this situation. She didn't even balance before lunchtime or periodically like the procedure states. She did have time, time did permit for her to balance.

> We have been reminded daily and constantly that we must make a ticket before getting the money out of the vault [but] this procedure wasn't followed by her. I don't understand why she did not follow it liked [sic] the rest of us.

(Aplt. App. at 151)

On November 18, 2019, the Bank terminated Ms. Ortiz from her employment. The decision to terminate Ms. Ortiz's employment was made by Ms. Moulin, Vicki Carey (who is the Bank's Vice President and Director of Human Resources), and Mary Bucke (who was then the Bank's Senior Vice President of Retail Sales and Services). (Aplt. App. at 28, 71) Ms. Ortiz was informed that the decision to terminate her employment was because she forced balanced the

vault and falsified the vault log, in violation of the Bank's Teller Difference Guidelines, Code of Ethics, and Bank Vault and Teller Cash Procedures. (Aplt. App. at 71)

Ms. Moulin testified that she did not recommend that Ms. Ortiz be terminated from her employment. Rather, Ms. Moulin recommended that Ms. Ortiz be given a final written warning, just like Ms. Hayes was given. (Aplt. App. at 146) Ms. Moulin explained:

> Q.     And with regards to Charlotte [Hayes] …, did she receive a final written warning or a written warning?
>
> A.     A written warning.
>
> Q.     And do you think a written warning was appropriate discipline?
>
> A.     Yes.
>
> Q.     Why is that?
>
> A.     Because it caused Maira [Oritz] to be out of balance.
>
> Q.     <u>So Charlotte Hayes' failure to write a ticket caused the vault to be out of balance, correct?</u>
>
> A.     <u>Correct.</u>

(Aplt. App. at 148-149. Emphasis added.)

## E. <u>The District Court's Decision</u>

The district court granted summary judgment in favor of the Bank on all of Ms. Ortiz's claims of sex and pregnancy discrimination under Title VII. In regard to the first two of Ms. Ortiz's claims - - that the Bank discriminated against her by

refusing to allow her to use the bathroom in the McDonald's next door to the

Bank, and that the Bank discriminated against her by refusing to allow her to use

a chair while not helping customers - - the district court concluded that Ms. Ortiz

has failed to establish a prima facie case of discrimination. (Aplt. App. at 163-

165) The district court explained:

> Defendant does not dispute that Plaintiff's termination is an adverse employment action, but challenges whether denying her the use of a chair and access to the McDonald's restroom when there are fewer than two employees on duty constitute adverse employment actions. Plaintiff responds that denying her the use of a chair and her preferred restroom created a significant risk of humiliation and physical discomfort to her. The Court agrees with Defendant that these two actions did not rise to the level of adverse employment actions and were instead mere inconveniences.

(Aplt. App. at 164)

In regard to Ms. Ortiz's claim that the Bank discriminated against her by

terminating her from her employment the district court concluded that Ms. Ortiz

failed to demonstrate that the Bank's stated reason for her termination was a

pretext for sex discrimination. The district court stated:

> In sum, Plaintiff cannot point to evidence in the summary judgment record that calls into question Defendant's proffered reason for its termination decision. Therefore, summary judgment is granted on her remining claim of sex discrimination based on her termination.

(Aplt. App. at 170)

## ARGUMENTS AND AUTHORITIES

This court reviews the district court's grant of summary judgement de novo, applying the same standard as the district court. *Crow .v. ADT Sec. Services, Inc.,* 649 F.3d 1189, 1194 (10th Cir. 2011). In deciding a motion for summary judgment, the court must determine whether there is a genuine issue as to any material fact, and whether the moving party is entitled to judgment as a matter of law. *Garrett v. Hewlett-Packard Company*, 305 F.3d 1210, 1216 (10th Cir. 2022). In considering whether there are any genuine issues of material fact, "the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party." *Gullickson v. Southwest Airlines Pilots' Ass'n*, 87 F.3d 1176, 1183 (10th Cir. 1996), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In analyzing a summary judgment motion, the court "may not make credibility determinations or weigh the evidence," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). The nonmoving party must be given "wide berth to prove a factual controversy exist." *Jeffries v. State of Kansas.*, 147 F.3d 1220, 1228 (10th Cir. 1998)

Here, Ms. Ortiz contends that the Bank discriminated against her because of her sex and pregnancy, in violation of Title VII: (1) by refusing to allow her to

use the bathroom in the McDonald's next door to the Bank; (2) by refusing to allow her to use a chair while not helping customers; and (3) by terminating her from her employment. For the reasons discussed below, a reasonable jury, faced with evidence presented, could return a verdict in favor of Ms. Ortiz on all three of her claims of discrimination.

## I. A REASONABLE JURY, FACED WITH THE EVIDENCE PRESENTED, COULD RETURN A VERDICT IN FAVOR OF MS. ORTIZ ON HER CLAIM THAT THE BANK DISCRIMINATED AGAINST HER BY REFUSING TO ALLOW HER TO USE THE BATHROOM IN THE MCDONALD'S NEXT DOOR TO THE BANK

A plaintiff alleging discrimination "may prove intentional discrimination through either direct evidence of discrimination (_e.g._ oral or written statements on the part of a defendant showing a discriminatory motive) or indirect (_i.e._ circumstantial) evidence of discrimination." _Kendrick v. Penske Transp. Servs._, 220 F.3d 1220, 1225 (10th Cir. 200). Where, as here, the plaintiff only relies on circumstantial evidence of discrimination, the framework for assessing the circumstantial evidence is the burden-shifting framework set forth by the Supreme Court in _McDonnell Douglas Corp. v. Green_, 411 U.S. 792 (1973). _Kendrick_, 220 F.3d at 1225. See also _Orr v. City of Albuquerque_, 417 F.3d 1144, 1149 (10th Cir. 2005).

### A. The McDonald Douglas Burden-Shifting Framework

In _Kendrick_, 220 F.3d at 1225-26, this court explained the _McDonnell Douglas_ burden-shifting framework in this way:

> Under the _McDonnell Douglas_ framework, the plaintiff 'must carry the initial burden under the statute of establishing a prima facie case of discrimination.' _McDonnell Douglas_, 411 U.S. at 802. Once the plaintiff has established a prima facie case, 'the burden then must shift to the [defendant] to articulate some legitimate, nondiscriminatory reason' for its … action. _See id_. at 802. If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual. _See id._ at 804.

To establish a prima facie case of discrimination, a plaintiff must show "that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." _Bird v. Regents of N.M. State Univ._, 619 Fed. Appx. 733, 741 (10th Cir. 2015), quoting _EEOC v. PVNF, L.L.C._, 487 F.3d 790, 800 (10th Cir., 2007).

In regard to Ms. Ortiz's claim that the Bank discriminated against her by refusing to allow her to use the bathroom in the McDonald's next door to the Bank, the district court concluded that Ms. Ortiz failed to establish a prima facie case of discrimination because the Bank's refusal did not constitute an "adverse employment action." (Aplt. App. at 164) The district court erred in reaching this conclusion.

## B. The Tenth Circuit's Liberal Definition of
## "Adverse Employment Actions"

The Tenth Circuit liberally defines what constitutes an "adverse employment action" under Title VII. As this court explained in _Sanchez v. Denver Schools_, 164 F.3d 527 (10th Cir. 1998):

> The Tenth Circuit liberally defines the phrase 'adverse employment actions.' Such actions are not limited to monetary losses in the form of wages and benefits. Instead, we take 'a case-by-case approach,' examining the unique factors relevant to the situation at hand. Nevertheless, we will not consider 'a mere inconvenience or an alteration of job responsibilities' to be an adverse employment action.

164 F.3d at 532. Citations omitted. See also _Braxton v. Nortek Air Solutions, LLC_, 796 Fed. Appx. 600, 604 (10th Cir. 2019) [also stating that in liberally defining the phrase adverse employment action, "we consider acts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects"]; _EEOC v. C.R. England, Inc._, 644 F.3d 1028, 1040 (10th Cir. 2007).

Here, "the unique factors relevant to the situation at hand," _Sanchez_, 164 F.3d at 532, are the following: Prior to October of 2019, Ms. Ortiz was allowed to leave the Shawnee Branch facility when there were only two employees in the branch and use the McDonald's restroom. (Aplt. App. at 20) However, in the latter part of October of 2019, Ms. Hayes told Ms. Ortiz that she could not use the McDonald's restroom until Ms. Hayes, or another teller, started their shift. (Aplt. App. at 81) In the latter part of October of 2019, Ms. Ortiz was about six months

along in her pregnancy. (Aplt. App. 80) At this point in time, Ms. Ortiz "need[ed] to go often to the bathroom." (Aplt. App. at 80)

In light of these "unique factors," 164 F .3d at 832, a reasonable jury could find that Ms. Hayes' refusal to allow Ms. Ortiz to use the McDonald's restroom constitutes an "adverse employment action" under this court's liberal definition of that phrase. In particular, a reasonable jury could find that Ms. Hayes' action "carr[ied] a significant risk of humiliation" and also physical discomfort to Ms. Ortiz. _Braxton_, 769 Fed, Appx. at 604, quoting _Annett v. University of Kansas_, 371 F.3d 1233, 1239 (10th Cir. 2004).

## II. A REASONABLE JURY, FACED WITH THE EVIDENCE PRESENTED, COULD RETURN A VERDICT IN FAVOR OF MS. ORTIZ ON HER CLAIM THAT THE BANK DISCRIMINATED AGAINST HER BY REFUSING TO ALLOW HER TO USE A CHAIR WHILE NOT HELPING CUSTOMERS

### A. The McDonald Douglas Burden-Shifting Framework

In regard to Ms. Ortiz's claim that the Bank discriminated against her by refusing to allow her to use a chair while not helping customers, the district court again concluded that Ms. Ortiz failed to establish a prima facie case of discrimination because the Bank's refusal did not constitute an "adverse employment action." (Aplt. App. at 164) Again, the district court erred in reaching this conclusion.

### B. The Unique Factors Relevant To The Present Case

In regard to the Bank's refusal to allow Ms. Ortiz to use a folding chair, "the unique factors relevant to the situation at hand," _Sanchez_, 164 F.3d at 532, are

the following: When Ms. Ortiz returned from her vacation in October of 2019, she was about six months along in her pregnancy, and her feet started getting swollen. Consequently, Ms. Ortiz started sitting on a folding chair when she was not helping a customer. The folding chair was small enough to fit in her cubicle. (Aplt. App. at 81, 121)

However, shortly after Ms. Ortiz began using the folding chair to sit down, Ms. Hayes took the chair away from her. Ms. Hayes told Ms. Ortiz that it was a new rule or policy that she could only use one of the two chairs in the drive-through window area. (Aplt. App. at 81, 124-129) Ms. Ortiz specifically told Ms. Hayes that the chairs in the drive-through were too big to fit in her cubicle. However, Ms. Hayes ignored Ms. Ortiz's statement, and took no further action. (Aplt. App. at 125, 131-133)

In light of these "unique factors," _Sanchez_, 164 F .3d at 532, a reasonable jury could find that Ms. Haye's refusal to allow Ms. Ortiz to use a folding chair constitutes and "adverse employment action" under the Tenth Circuit's liberal definition of that phrase. Again, a reasonable jury could find that Ms. Hayes action "carr[ied] a significant risk of humiliation" and also physical discomfort to Ms. Ortiz. _Braxton_, 769 Fed. Appx. at 604, quoting _Annett_, 371 F.3d at 1329.

### III. A REASONABLE JURY, FACED WITH THE EVIDENCE PRESENTED, COULD RETURN A VERDICT IN FAVOR OF MS. ORTIZ ON HER CLAIM THAT THE BANK DISCRIMINATED AGAINST HER BY TERMINATING HER EMPLOYMENT

### A. The McDonald Douglas Burden-Shifting Framework

In regard to Ms. Ortiz's claim that the Bank discriminated against her by terminating her employment, the district court analyzed the first two stages of the McDonald Douglas burden-shifting framework as follows:

> The court assumes without deciding the Plaintiff can establish a prima facie case on her remining claim of sex discrimination based on her termination. Therefore, the burden of production shifts back to Defendant to articulate a facially nondiscriminatory reason for Plaintiff's termination. Defendant meets this burden by stating that it terminated Plaintiff for force balancing the vault on November 1, 2019, which is a terminable offense under Bank Policies.

(Aplt. App. at 166)

In regard to the third stage of the burden-shifting framework, the district court ultimately concluded that Ms. Ortiz failed to raise a genuine factual issue as to pretext, stating:

> In sum, Plaintiff cannot point to evidence in the summary judgment record that calls into question Defendant's proffered reason for its termination decision. Therefore, summary judgment is granted on her remining claim of sex discrimination based on her termination.

(Aplt. App. at 170) Once again, the district court erred in reaching this conclusion.

**B. <u>Evidence of Pretext</u>**

As third stage of the burden-shifting analysis, the plaintiff bears the ultimate burden of showing there is a genuine factual dispute about whether the employer's proffered explanation is a pretext for discrimination. *<u>Lobato v. New Mexico Ev't Dep't</u>*, 733 F.3d 1283, 1289 (10th Cir. 2013). "[A] plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *<u>Zamora v. Elite Logistics, Inc.</u>*, 478 F.3d 1160, 1166 (10th Cir. 2007).

Here, Ms. Ortiz has come forward with three pieces of circumstantial evidence from which a reasonable jury could infer a discriminatory motive: (1) preferential treatment of a similarly-situated employee; (2) inconsistencies or incoherencies in the Bank's explanation for terminating Ms. Ortiz; and (3) the falsity of the Bank's explanation for terminating Ms. Ortiz. These three pieces of circumstantial evidence will be addressed in turn.

**(1.) <u>Preferential Treatment of A Similarly-Situated Employee</u>**

Ms. Ortiz's first piece of circumstantial evidence from which a reasonable jury could infer a discriminatory motive consists of "preferential treatment given to employees outside the protected class." *<u>Barlow v. C.R. Eng., Inc.</u>*, 703 F.3d 497, 505 (10th Cir. 2012).

A plaintiff can raise an inference of discrimination "by providing evidence that [she] was treated differently from other similarly-situated employees who

violated work rules of comparable seriousness." *Macon v. UPS*, 743 F.3d 708, 718 (10th Cir. 2014), quoting *Kendrick*, 220 F .3d at 1231. To establish that an employee is similarly-situated, the plaintiff must show "the employee deals with the same supervisor and is subject to the same standards governing performance evaluations and discipline." *Macon*, 743 F.3d at 718, quoting *Kendrick*, 220 F.3d at 1232. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007)

Here, a reasonable jury could find that Ms. Ortiz and Ms. Hayes are similarly-situated employees. First of all, they both dealt with the same supervisors, namely, Ms. Moulin, Ms. Kearns, and Ms. Carey. (Aplt. App. at 28, 71, 148-149)

Furthermore, Ms. Ortiz and Ms. Hayes were both subject to the same standards governing performance and discipline, namely, the Bank's Code of Ethics, which contains the following statement:

> Violations of the Code of Ethics could lead to disciplinary action, including termination.
>
> ….
>
> Examples of inappropriate conduct are listed below (this list is not all inclusive)
>
> ….
>
> - Force balancing Bank records, teller drawers, cash vaults, etc. …

- Making or causing false entries to the books or records of the Bank.

(Aplt. App. at 92. Emphasis in original.)

Finally, Ms. Ortiz and Ms. Hayes both violated work rules of comparable seriousness, namely, the Bank's Code of Ethics. Ms. Ortiz's supervisors ostensibly believed that she had force balanced the vault and falsified the vault log. (Aplt. App. at 71) In addition, Ms. Moulin believed that Ms. Hayes was guilty of "causing" Ms. Ortiz to force balance the vault. Specifically, Ms. Moulin agreed that "Charlotte Hayes' failure to write a ticket <u>caused</u> the vault to be out of balance." (Aplt. App. at 149. Emphasis added.)

Because Ms. Ortiz and Ms. Hayes violated work rules of comparable seriousness, Ms. Moulin recommended that they both be given a final warning. (Aplt. App. at 146) However, Ms. Kearns and Ms. Carey decided to treat Ms. Hayes more favorably than Ms. Ortiz: Ms. Hayes was given a final warning, but Ms. Ortiz was terminated from her employment. (Aplt. App. at 71, 148) Based on this preferential treatment of Ms. Hayes (a non-pregnant employee), a reasonable jury could infer a discriminatory motive.

### (2.) <u>Inconsistencies, Incoherencies, or Contradictions In The Bank's Explanation</u>

The second piece of circumstantial evidence from which a reasonable jury could infer a discriminatory motive consists of such "inconsistencies, incoherencies or contradictions" in the employer's explanation that a "reasonable fact finder could rationally find the [employer's rationale] unworthy of credence

and hence infer that the employer did not act for the asserted [non-discriminatory] reason." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015).

Here, the Bank contends that Ms. Ortiz was terminated because she force balanced the vault on November 1, 2019. (Aplt. App. at 71) However, Ms. Ortiz continued working for the Bank, and being in charge of the vault, until her termination on November 18, 2019. (Aplt. App. at 147) In her deposition, Ms. Moulin was asked "[i]f force balancing a vault log was such a serious offense, why was Maira allowed to continue to work from November 1st to November 18th"? She answered: "I can't answer that." (Aplt. App. at 147) Based on these facts, a reasonable jury could find that the Bank's rationale for terminating Ms. Ortiz is "unworthy of credence." *Lounds*, 812 F.3d at 1234.

### (3.) False Explanation by the Bank

The third piece of circumstantial evidence from which a reasonable jury could infer a discriminatory motive consists of "evidence that the defendant's stated reason for the adverse employment action was false." *Kendrick*, 220 F.3d at 1230, citing *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1380-81 (10th Cir. 1994). See also *Lounds*, 812 F.3d at 1208.

Here, again, the Bank asserts that Ms. Ortiz was terminated because she force balanced the vault log on November 1, 2019. (Aplt. App. at 71) However, a reasonable jury could find this explanation to be false for several reason. First of all, Ms. Moulin testified that "force balancing" is an intentional act almost like

"theft." (Aplt. App. at 136-137) Furthermore, during their meeting on November 4, 2019, Ms. Ortiz told Ms. Moulin that she did not intentionally force balance vault. Ms. Ortiz explained that she had "pregnancy brain," and couldn't remember things. (Aplt. App. at 144-145) Finally, it is undisputed that no money was missing as a result of the events on November 1, 2019. (Aplt. App. at 144-145)

### (4.) <u>Summary</u>

The three pieces of circumstantial evidence discussed above, in combination, are sufficient to raise a genuine factual issue as to pretext because judgments about intent are best left for trial. As this court emphasized in *<u>Randle v. City of Aurora</u>*, 69 F.3d 441 (10th Cir. 1995):

> It is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind. So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant proffered nondiscriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial. <u>Judgments about intent are best left for trial and are within the province of the jury.</u>

69 F.3d at 453. Emphasis added.

### <u>CONCLUSION</u>

For all of the reason discussed above, a reasonable jury, faced with the evidence presented, could return a verdict in favor of Ms. Ortiz on all three of her claims of discrimination. Consequently, the judgment entered in favor of the Bank must be reversed and the case must be remanded to the district court for further proceedings.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32</u>

Pursuant to Fed. R. App. Pro. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 7009 words. I relied on my word processor to obtain this count, and it is Microsoft Word Office 365.

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

No privacy redactions were necessary in this document. The document submitted in digital form is an exact copy of the written document filed with the Clerk. The document is a native PDF document. The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection - Antivirus and Antispyware Protection Program, most recently updated September 14, 2022, and, according to the program, is free of viruses.

## <u>ORAL ARGUMENT</u>

Oral argument is not requested in this case because the issues are straight forward, and oral argument would not likely aid this court in analyzing the issues.

  s/Alan V. Johnson
Alan V. Johnson, KS #9992
Sloan, Eisenbarth, Glassman,
 McEntire & Jarboe, L.L.C.
534 s. Kansas Ave, Suite 1000
Topeka, Kansas 66603
Telephone   (785) 357-6311
Fax          (785) 357-0152
ajohnson@sloanlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I herby certify that on the 15th day of September, 2022, I delivered a copy of the foregoing document via ECF and electronic mail to the following parties:

Julianne P. Story, #15227
Michaeli Hennessey, #79006
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Julianne.story@huschblackwell.com
michaeli.hennessey@huschblackwell.com
ATTORNEYS FOR DEFENDANT


 /s/Alan V. Johnson
Alan V. Johnson, KS #9992
ajohnson@sloanlawfirm.com

# APPENDIX

Case 2:21-cv-02316-JAR   Document 34   Filed 06/09/22   Page 1 of 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MAIRA ORTIZ, | |
| Plaintiff, | |
| v. | Case No. 21-2316-JAR-KGG |
| BANK OF LABOR, | |
| Defendant. | |

**MEMORANDUM AND ORDER**

Plaintiff Maira Ortiz filed suit against her former employer, Defendant Bank of Labor, alleging discrimination claims under the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964. Before the Court is Defendant's Motion for Summary Judgment (Doc. 24) and Plaintiff's Motion for Leave to File Surreply (Doc. 31). The motions are fully briefed, and the Court is prepared to rule. The Court grants Plaintiff's motion for leave to file a surreply and considered that proposed filing in ruling on the summary judgment motion. For the reasons set forth in detail below, the Court grants summary judgment in favor of Defendant.

**I.    Legal Standard**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under

the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue

of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and

entitlement to judgment as a matter of law.[6]  Once the movant has met this initial burden, the

burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine

issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its

burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in

evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]

To accomplish this, the facts "must be identified by reference to an affidavit, a deposition

transcript[,] or a specific exhibit incorporated therein."[10]  The non-moving party cannot avoid

summary judgment by repeating conclusory opinions, allegations unsupported by specific facts,

or speculation.[11]

---

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Lab'ies, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

[7] *Anderson*, 477 U.S. at 256.

[8] *Id.*

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[11] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

Case 2:21-cv-02316-JAR   Document 34   Filed 06/09/22   Page 3 of 19

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[12]

## II.   Facts

The following facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.

Plaintiff Maira Ortiz is a Hispanic female.  Defendant Bank of Labor ("Defendant" or "the bank") is a Kansas-based corporation originally founded as a labor community bank, which maintains branch locations throughout the State of Kansas and in the District of Columbia. Plaintiff was hired by Defendant in May 2018 to fill a Universal Banker 1 Bilingual role at the bank's Shawnee Drive location.  The Shawnee Drive branch is a small location that shares a building and bathrooms with a 7-Eleven.  Plaintiff's direct supervisor was Branch Supervisor Charlotte Hayes; her next level-supervisor was Branch Manager Mary Moulin.

### *Plaintiff's Access to Restrooms and Chairs*

There were two restrooms in the 7-Eleven.  One was out of order and the other was always dirty.  Therefore, Shawnee Drive branch bank employees generally used a restroom in the McDonald's located next door to the bank's building.  In June 2019, Plaintiff learned that she was pregnant; she informed Hayes in September 2019, when she was about five months' pregnant.  Prior to October 2019, Plaintiff was allowed to leave the Shawnee Drive branch when there were only two employees for the purpose of using the McDonald's restroom, located in a separate building next door.  When Plaintiff returned from vacation in October 2019, Hayes told her she could no longer use the McDonald's restroom until Hayes or another teller began their

---

[12] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

shift because the bank required two people to be in the bank at any given time when it is open for security purposes. Plaintiff and another co-worker usually began their shifts at 7:15 a.m. Once Hayes arrived at 9:45 or 10:00 a.m., Plaintiff was able to use the McDonald's restroom because more than two employees were present.

After Plaintiff's October 2019 vacation, her feet started swelling at work, so she began sitting in a folding chair that fit inside her cubicle when she was not assisting a customer. Hayes took the chair away from Plaintiff three different times and told her that there had been a policy change and that if she wanted to use a chair, she needed to use one from the drive-through window area. Plaintiff could not carry the chairs from the drive-through window to her cubicle and the chairs at the drive through window did not fit into the teller window cubicle where Plaintiff worked. Hayes ignored Plaintiff when she tried to tell her that she could not carry the drive-through chairs and that they would not fit in her cubicle.

### *Vault Balancing*

In support of its security measures, the bank implements and maintains policies related to vault security, including the Teller Difference Guidelines, the Bank Vault and Teller Cash Procedures, and the Code of Ethics (collectively, "Bank Policies"). For example, the Teller Difference Guidelines provide:

> DIFFERENCES
>
> All differences regardless of the amount will be recorded on the teller's over/short record. Teller differences of $1 or more will be counted. All cash differences must be reported to a directed supervisor or manager immediately. Teller differences of $50 or more also require a dual control audit to be completed . . . .
>
> . . . .
>
> DISMISSAL

In addition to the Balancing Standards and Probation guidelines listed above, a teller may be terminated for any of the reasons listed below:

- Force balancing of Bank Records, teller drawers, cash vaults, etc. in any way to avoid a cash difference. . . .[13]

A teller forgetting to write a ticket when cash is taken from the vault to fill their drawer is not listed as a terminable offense under the "Dismissal" section of the Teller Difference Guidelines. It is also not listed as an example of inappropriate conduct in the Code of Ethics that could lead to termination, although "[m]aking or causing false entries to the books or records of the Bank" is on the list of inappropriate conduct subject to discipline that could include termination.

The Bank Vault and Teller Cash Procedures provide the following guidance regarding vault cash balancing:

- Every precaution is to be taken to avoid a situation that causes the cash vault to be out of balance.  The use of dual control in every transaction that involves vault cash should help accomplish that goal.  If a vault is found to be out of balance, the branch management team should follow the steps outlined in the Teller Difference Procedures.  After balancing is complete, all tickets will be scanned with teller work.[14]

These procedures also address how tellers are to buy cash from the vault:

- The teller will prepare a Cash In ticket for the amount of cash needed, recording the denomination and amount of currency/coin requested on the Cash In ticket.
- The Vault Teller upon receiving the Cash In ticket will fill the cash order from the teller, utilizing that teller for the dual control process.
- The Vault Teller will prepare the vault Cash Out ticket for the amount of the sale.  The tickets will be initialed by both

---

[13] Doc. 25-3 at 1, 3.

[14] Doc. 25-4 at 5.

Case 2:21-cv-02316-JAR    Document 34    Filed 06/09/22    Page 6 of 19

parties and placed in the designated area for vault tickets
until vault count and balancing is complete.[15]

In order to ensure that the bank has an accurate count of cash in its vaults and teller

drawers, Defendant has vault-balancing and dual-control procedures.  As part of the bank's dual-

control procedures, at the beginning and end of each shift, two employees are expected to count

the cash in the vault of each branch and confirm that the amount of cash listed in the vault

matches the amount of cash recorded on the written vault log and on the bank's internal online

banking system.  One bank employee is required to call out the amount of cash in the vault and

the second employee should document the amount on the written vault log.  The vault log is then

checked against the amount of cash listed in the bank's internal online banking system.  If the

amount of cash listed on the written vault log matches the amount listed on the bank's internal

online banking system, the vault is balanced.  When tellers take cash from the vault to fill their

drawers, they are expected to write a ticket documenting the amount of cash withdrawn from the

vault.

Plaintiff was aware of Defendant's Bank Policies, including those governing force

balancing and how to handle cash differences, and understood that she was expected to comply

with these policies.  "Force balancing" is the act of modifying a bank record, such as a vault log

or teller log, to avoid a cash difference.  A "cash difference" occurs when the amount of cash in a

drawer or vault does not match the amount recorded on the drawer or vault log.  A cash

difference can also occur when the amount of cash recorded on a vault log does not match the

amount of cash recorded on the bank's online banking system.  When a bank employee becomes

---

[15] *Id.* at 4.

Case 2:21-cv-02316-JAR   Document 34   Filed 06/09/22   Page 7 of 19

aware of a cash difference while counting the vault, they are expected to notify their supervisor of the cash difference and recount the vault.

As a Universal Banker 1, one of Plaintiff's job responsibilities was to count the cash in the bank vault under the bank's dual-control process. After counting the cash in the vault under the dual-control process, Plaintiff was then expected to sign off on the amount of cash in the vault via the bank's vault log to confirm that it matched the amount of cash listed in the bank's internal online banking system.

On November 1, 2019, Plaintiff and Hayes were working a shift together at the Shawnee Drive branch. Hayes purchased $25.00 in pennies from the vault from her drawer but forgot to write a ticket. Plaintiff counted the cash in the vault with a co-worker at the end of her shift. Plaintiff found a $25.00 cash difference between the amount in the vault and the amount listed on the vault log. Plaintiff, who was standing about twenty feet away from Hayes' desk, asked if anybody had tickets from the vault. The only people who responded to her question were the tellers, who each said "no." Hayes looked up and Plaintiff stated that there was a $25 discrepancy. Hayes looked at Plaintiff but did not move from her desk or respond. After identifying the cash difference, Plaintiff whited-out the original cash amount on the vault log and entered another number which was $25.00 less than the original amount. She did not recount the vault. Plaintiff admitted during her deposition that her conduct amounted to modifying a bank record to balance the vault log, and that her failure to report the cash difference violated the Teller Difference Guidelines. Plaintiff understood that force balancing was a terminable offense.

Moulin learned of the vault balancing issue at the end of the day on November 1, 2019, after the bank closed for the day. Hayes reported to her that the vault was out of balance, that she had forgotten to make up a ticket from the vault, and that Plaintiff had force balanced the

vault.  Hayes told Moulin that she made the ticket for the vault, and then balanced the vault and

her drawer.

On the following Monday, November 4, 2019, Moulin met with Hayes and Plaintiff to

discuss the vault balance incident from November 1.  Hayes told Plaintiff that Hayes had made a

mistake, so there was no money missing after all.  Plaintiff stated that she did not intentionally

force balance the vault, but she had "pregnancy brain" causing her to forget things.

Hayes received a documented written warning for failing to write a ticket when she purchased

pennies from the vault on November 1, 2019.  Plaintiff testified that she was aware of other

Shawnee Drive branch employees who forgot to write tickets in the past and were not

terminated.  She further testified that she was unaware of any non-pregnant employee who was

not terminated after force balancing the vault.

Plaintiff continued to work for Defendant and was in charge of the vault until November

18, 2019, when Defendant terminated Plaintiff, effective on that date.  Moulin, then-Senior Vice

President/Retail Sales and Services Mary Buche, and Vice President and Director of Human

Resources Vicki Carey made the decision to terminate Plaintiff.  However, Moulin did not

recommend termination.  She recommended that Plaintiff receive a written warning like Hayes

received.  Defendant told Plaintiff that the decision to terminate her employment was because

she force balanced the vault and falsified the vault log in violation of the Bank Policies.

**III.     Discussion**

Plaintiff brings two claims of discrimination tied to her pregnancy: (1) discrimination on

the basis of sex under Title VII; and (2) disability discrimination under the ADA.  Plaintiff

identifies three discrete employment actions that give rise to both claims: (1) Defendant's refusal

to allow her to use the McDonald's restroom during her pregnancy when there were two or less

employees on duty; (2) Defendant's refusal to allow her to use a chair during her pregnancy; and (3) her termination.

Because Plaintiff does not rely on direct evidence of discrimination, the Court considers her claims under the familiar burden-shifting analysis set forth in *McDonnell Douglas v. Green*.[16]  Under *McDonnell Douglas*, the plaintiff initially bears the burden of production to establish a prima facie case of discrimination.[17]  The burden of establishing the prima facie case is "not onerous."[18]  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[19]  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[20]

The Court considers Plaintiff's ADA and Title VII discrimination claims under this framework below.[21]  The Court first addresses the disability discrimination claim and the claims regarding Defendant's decision to deny Plaintiff the use of a chair and the use of her preferred restroom when there were only two employees at her bank branch and finds that Plaintiff has no evidence to support a prima facie case on these claims.  The Court assumes without deciding that

---

[16] 411 U.S. 792 (1973); s*ee Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018).

[17] 411 U.S. at 802.

[18] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[19] *Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[20] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[21] Despite couching her requests for a chair and use of a specific restroom as requests for reasonable accommodations, the Pretrial Order otherwise makes clear that Plaintiff's ADA claim is for discrimination.  Doc. 23 at 8–9.  She does not assert a separate claim for reasonable accommodation that would trigger a modified *McDonnell Douglas* analysis.  *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018).  Plaintiff's response brief is consistent with the Pretrial Order, describing her claims as sex discrimination under Title VII, and disability discrimination under the ADA.  Doc. 28 at 11.  Thus, the Court does not consider Plaintiff's ADA claims under the modified *McDonnell Douglas* framework addressed in Defendant's opening brief.

Case 2:21-cv-02316-JAR    Document 34    Filed 06/09/22    Page 10 of 19

Plaintiff can establish a prima facie case of sex discrimination under Title VII regarding her termination.  However, the Court grants Defendant's motion for summary judgment because there is no genuine issue of material fact that Defendant's proffered non-discriminatory reason for the termination is unworthy of belief.

### A.    Prima Facie Case

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show that she "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability."[22]  "In order to demonstrate 'discrimination,' a plaintiff generally must show that [she] has suffered an 'adverse employment action' because of the disability."[23]

To set forth a prima facie case of discrimination under Title VII, a plaintiff must establish (1) membership in protected class; (2) an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.[24]

Defendant argues that Plaintiff cannot meet her non-onerous burden of establishing a prima facie case of sex or disability discrimination.  As for disability discrimination, Defendant urges that Plaintiff is not disabled under the ADA under established law in this district that holds pregnancy alone is not a disability under the statute.  Defendant further argues that its decisions denying her the use of a chair while she was working and the use of the McDonald's restroom

---

[22] *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037−38 (10th Cir. 2011) (quoting *Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1086 (10th Cir. 2008)).

[23] *Id.* at 1038 (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)) (collecting cases).

[24] *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context); *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (acknowledging that the Tenth Circuit has used different versions of the prima facie test, but stating that it has "express[ed] a preference for more concise formulations." (citations omitted)).

Case 2:21-cv-02316-JAR    Document 34    Filed 06/09/22    Page 11 of 19

when there were two or less employees in the bank, are not adverse employment actions. Finally, Defendant argues that Plaintiff's termination did not occur under circumstances giving rise to an inference of discrimination. As described below, the Court agrees with Defendant that summary judgment is warranted on the disability discrimination claim because Plaintiff is not within the protected class, and on the chair and restroom claims because they do not constitute adverse employment actions. The Court assumes without deciding that Plaintiff can meet her non-onerous burden of demonstrating a prima facie case of sex discrimination based on her termination and proceeds to consider whether Defendant's stated nondiscriminatory reason for her discharge was a pretext for pregnancy discrimination, finding it was not.[25]

### 1.    Disability Discrimination

Plaintiff asserts she is disabled under the ADA based on her pregnancy. Under the ADA, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."[26] The 2008 amendments to the ADA ("ADAAA") make establishing a disability easier for plaintiffs and were intended to ensure that "the definition of disability . . . [is] construed in favor of broad coverage."[27] "To constitute a disability under the ADAAA, plaintiff must show she was pregnant and had a related mental or physical impairment."[28] Plaintiff concedes that this is the

---

[25] Title VII prohibits discrimination on the basis of sex. 42 U.S.C. § 2000e-2(e)(1). The Pregnancy Discrimination Act amended the definition of "on the basis of sex" to include "pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." *Id.* § 2000e(k). Thus, there is no dispute that Plaintiff belongs to a protected class under Title VII.

[26] 42 U.S.C. § 12102(1).

[27] *Id.* § 12102(4)(A).

[28] *Shaw v. T-Mobile*, No. 18-2513-DDC-GEB, 2020 WL 5231309, at *12 (D. Kan. Sept. 2, 2020).

Case 2:21-cv-02316-JAR   Document 34   Filed 06/09/22   Page 12 of 19

governing law in this district and that she cannot meet this standard. Instead, Plaintiff seeks to preserve the issue for appeal. Acknowledging Plaintiff's objection, the Court follows cases within this district that consistently conclude pregnancy alone, without a related mental or physical impairment, is insufficient to meet the definition of "disability" under the ADA and ADAAA.[29] Summary judgment is therefore granted on Plaintiff's disability discrimination claim.

### 2. Adverse Employment Action—Denial of a Chair and Access to McDonald's Restroom

As already discussed, Plaintiff must come forward with evidence of an adverse employment action to establish a prima facie case of discrimination under both statutes. Although the Tenth Circuit takes a broad view of what constitutes an adverse employment action, "mere inconvenience or an alteration of job responsibilities" does not qualify.[30] An adverse employment action with respect to a discrimination claim "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[31] The liberal definition of "adverse employment action" includes "acts that carry 'a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects.'"[32] "[N]ot everything that makes an employee unhappy is an actionable adverse

---

[29] See id.; Gudenkauf v. Stauffer Commc'ns, Inc., 922 F. Supp. 465, 472–74 (D. Kan. 1996); Richards v. City of Topeka, 934 F. Supp. 378, 382 (D. Kan. 1996), aff'd, 173 F.3d 1247 (10th Cir. 1999); Wiseman v. Wal-Mart Stores, Inc., No. 08-1244-EFM, 2009 WL 10706901, at *4 (D. Kan. July 23, 2009).

[30] Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir. 1998) (citations omitted).

[31] Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (collecting cases).

[32] Annett v. Univ. of Kansas, 371 F.3d 1233, 1239 (10th Cir. 2004) (quoting Berry v. Stevinson Chevrolet, 74 F.3d 980, 986 (10th Cir. 1996)).

action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."[33]

Defendant does not dispute that Plaintiff's termination is an adverse employment action, but challenges whether denying her the use of a chair and access to the McDonald's restroom when there are fewer than two employees on duty constitute adverse employment actions. Plaintiff responds that denying her the use of a chair and her preferred restroom created a significant risk of humiliation and physical discomfort to her. The Court agrees with Defendant that these two actions did not rise to the level of adverse employment actions and were instead mere inconveniences.

The uncontroverted facts establish that Plaintiff was not wholly denied the use of a chair while she was working. Hayes removed a folding chair from her cubicle, but told her she could use one of the chairs from the drive-through window—a policy that also applied to her co-workers. While the chair with which she was provided was heavy and did not fit well in her cubicle, such facts made it more of an inconvenience than an action that impacted a condition of employment. There is no evidence Plaintiff requested an accommodation with Human Resources, or that her doctor submitted a note on her behalf recommending she use a chair while working that Defendant ignored.

Likewise, Plaintiff was not denied access to a restroom during her pregnancy. To be sure, Plaintiff testified that the 7-Eleven restroom was dirty, but Plaintiff had access to that restroom until Hayes arrived for her shift later in the morning. She testified that she and another co-worker usually began their shifts at 7:15 a.m. and that once Hayes arrive at 9:45 or 10:00

---

[33] *Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 604 (10th Cir. 2019) (quoting *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185–86 (10th Cir. 2018)).

Case 2:21-cv-02316-JAR    Document 34    Filed 06/09/22    Page 14 of 19

a.m., she was able to use the McDonald's restroom because more than two employees were present.

While Defendant's conduct may have risked Plaintiff's physical discomfort, evidence of humiliation alone is not sufficient to establish an adverse employment action.[34]  Moreover, neither action had any impact on Plaintiff's prospect for future employment, a key factor in determining whether an action is sufficiently adverse.[35]  Plaintiff does not explain how these actions effected the conditions of her employment, nor does she cite cases holding that analogous actions rise to the level of adverse employment actions.  The Court is unable to locate authority supporting a finding that these are adverse employment actions.[36]  Defendant's motion for summary judgment is therefore granted on both discrimination claims to the extent they are based on Defendant's refusal to allow Plaintiff to use a folding chair while working and its requirement that she not use the McDonald's restroom until more than two employees were present at the bank during operating hours.

---

[34] *Id.* at 605; *see Sanchez*, 164 F.3d at 532 n.6 (noting that in the case of a lateral transfer with no change to the conditions of employment, "the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer adverse employment action").

[35] *See Braxton*, 769 F. App'x at 605 (quoting *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004)).

[36] *See, e.g.*, *Evans v. Cap. Blue Cross*, No. 1:19-CV-497, 2021 WL 825764, at *11 (M.D. Pa. Mar. 4, 2021) (finding the defendant's replacement of a high-back chair with a low-back chair did not constitute adverse employment action); *Champagne v. Jacksonville State Univ.*, No. CV 08-RRA-1857-E, 2011 WL 13228313, at *13 (N.D. Ala. June 24, 2011) (finding allegations by plaintiff that she was without a computer and desk chair for a period of time did not constitute adverse employment actions); *Ryan v. O'Halloran Int'l, Inc.*, No. 4:03-CV-90531, 2004 WL 524431, at *1, *3 (S.D. Iowa Mar. 17, 2004) (finding removal of age discrimination plaintiffs' work station chairs that had been in place for years, requiring them to stand for eight hours per day despite younger employees being permitted to sit, in the face of letters from treating physicians supporting return of chairs, constituted adverse employment action); *Wilkes v. Nucor-Yamato Steel Co.*, No. 3:14-CV-00224-KGB, 2017 WL 4381684, *8 (E.D. Ark. Sept. 29, 2017) (finding no adverse employment action where there was no record evidence that lack of access to a particular restroom resulted in a material change to the plaintiff's employment status, such as a reduction in title, salary, or benefits); *Dauer v. Verizon Commc'ns Inc.*, No. 03 CIV. 05047 (PGG), 2009 WL 186199, at *3 n.3 (S.D.N.Y. Jan. 26, 2009) ("An employer's failure to provide clean, same-sex toilet facilities, standing alone, does not constitute an adverse employment action for purposes of establishing a prima facie case of discrimination."); *Gasperini v. Dominion Energy New England, Inc.*, No. CIV.A. 10-11246-JCB, 2012 WL 2402804, at *11 (D. Mass. June 25, 2012) ("[Plaintiff's] discomfort with the facilities, without more, does not constitute an adverse employment action.").

Case 2:21-cv-02316-JAR   Document 34   Filed 06/09/22   Page 15 of 19

**B.      Legitimate Nondiscriminatory Reasons for Termination**

The Court has concluded that Plaintiff cannot set forth a prima facie case of disability

discrimination, or sex discrimination based on Defendant's denial of the use of a folding chair

and access to the neighboring McDonald's restroom; therefore, summary judgment is granted on

those claims.  The Court assumes without deciding that Plaintiff can establish a prima facie case

on her remaining claim of sex discrimination based on her termination.  Therefore, the burden of

production shifts back to Defendant to articulate a facially nondiscriminatory reason for

Plaintiff's termination.  Defendant meets this burden by stating that it terminated Plaintiff for

force balancing the vault on November 1, 2019, which is a terminable offense under Bank

Policies.

**C.      Pretext**

The burden therefore shifts back to Plaintiff to demonstrate that Defendant's stated

reason for her termination is a pretext for sex discrimination.  Pretext evidence "may take a

variety of forms."[37]  Pretext may be shown by demonstrating "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence."[38]

Pretext can also be demonstrated by "direct evidence that the proffered rationale is false, or that

the plaintiff was treated differently from similarly-situated employees."[39]  "The critical question

regarding this aspect of the *McDonnell Douglas* rubric is whether 'a reasonable factfinder could

---

[37] *Dewitt v. S.W. Bell Tele. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (citing *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

[38] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[39] *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011) (citing *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167–68 (10th Cir. 2007)).

Case 2:21-cv-02316-JAR   Document 34   Filed 06/09/22   Page 16 of 19

rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons.'"[40]  The Court examines "the facts as they appear *to the person making the decision*."[41]

Plaintiff argues that Defendant's stated reason for her termination is unworthy of belief because there is evidence that Hayes, who was similarly situated, received preferential treatment when she violated Bank Policies by failing to write a cash ticket for the pennies she bought from the vault, causing the vault to be out of balance on November 1, 2019.  Plaintiff further contends that the force-balancing rationale is inconsistent, implausible, and false.  The Court addresses Plaintiff's pretext arguments below.[42]

### 1.      Similarly-Situated Employees

Pretext may be shown by evidence that Plaintiff "was treated differently from other similarly-situated employees who violated work rules of comparable seriousness."[43]  To be "similarly-situated," the employees must share the same decisionmaker, and be "disciplined for conduct of comparable seriousness."[44]  Plaintiff argues that she was treated less favorably than Hayes, despite them both violating Bank Policies on November 1, 2019.  It is uncontroverted that one of the three decisionmakers initially recommended that Plaintiff receive the same discipline as Hayes received for neglecting to fill out a cash ticket —a written warning—for force balancing the vault on November 1, 2019.

---

[40] *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (alteration in original) (quoting *Crowe*, 649 F.3d at 1196).

[41] *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (en banc) (quoting *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001)).

[42] Even if Plaintiff's disability discrimination claim based on termination survived the prima facie case inquiry, the result would be the same because she advances the same pretext arguments on both claims.

[43] *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

[44] *Id.* at 540–41.

But Defendant argues that Hayes did not violate a comparably serious rule; thus, her preferential treatment is not probative of pretext. The Court agrees. When comparing rule violations, "the comparison need not be based on identical violations of identical work rules; the violations need only be of comparable seriousness."[45] Plaintiff's and Hayes' violations were comparable in the sense that they both contributed to the cash difference in the vault on November 1, 2019. But the uncontroverted facts establish that force balancing is a violation subject to dismissal under the Teller Difference Guidelines, but failing to write a ticket when cash is taken from the vault is not. In fact, Plaintiff testified that she was aware of employees other than Hayes who had forgotten to write tickets for cash from the vault and were not terminated. She was unaware of other non-pregnant employees who engaged in force balancing and were not terminated. Thus, it was both policy and practice at the bank to treat force balancing more seriously than failing to write a cash ticket. Therefore, the Court finds that Defendant's preferential treatment of Hayes, a non-pregnant employee, fails to demonstrate that Defendant's stated reason for Plaintiff's termination is unworthy of belief.

## 2.    Inconsistencies, Incoherencies, and Contradictions

Next, Plaintiff argues that the force-balancing rationale is unworthy of belief because Defendant allowed her to continue working there until November 18, 2019. But Plaintiff fails to explain how the delay in her termination supports an inference of pretext. She suggests that if force balancing was a serious violation, it warranted immediate termination rather than a delayed decision. But this is pure speculation and fails to examine the facts as they appear to the persons making the termination decision. The delay between Plaintiff's infraction and her termination was not lengthy. The violation happened on November 1, 2019—a Friday. The following

---

[45] *Id.* at 541 (quoting *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir.1995)).

Monday, November 4, Moulin met with Hayes and Plaintiff to gather information about what happened the previous Friday.  It took approximately two weeks from that date for the three decisionmakers to reach their termination decision, which is evidence that the decision was difficult, not implausible or inconsistent.  Without more, the Court finds this evidence insufficient for a reasonable jury to infer that Defendant's stated reason for Plaintiff's termination is unworthy of belief.[46]

### 3.    False Explanation

Finally, Plaintiff argues that Defendant's force-balancing rationale for Plaintiff's termination is false.  Specifically, she compares Moulin's deposition testimony that force balancing is an intentional act, akin to theft, with Plaintiff's statement to Moulin and Hayes on November 4, 2019 that she did not intentionally force balance the vault.  Plaintiff told them that she had "pregnancy brain" and could not remember things.  Moreover, Plaintiff suggests that because no money was in fact missing from the vault, her force balancing should have been excused.

"To support an inference of pretext, . . . a plaintiff must produce evidence that the employer did more than get it wrong.  He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda."[47]  Plaintiff's evidence falls short of this standard.  The fact that Plaintiff may not have intentionally force balanced the vault does not excuse her violation of the Bank Policies, nor does it suggest that Defendant did not believe its reason for making the

---

[46] *See Riding v. Arup Lab'ies, Inc.*, No. 2:10-CV-01111-DN, 2013 WL 3049297, at *5 (D. Utah June 17, 2013) (finding delay between employee's alleged infraction and termination did not demonstrate pretext where there was neither a pattern of nor a lengthy delay).

[47] *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

Case 2:21-cv-02316-JAR   Document 34   Filed 06/09/22   Page 19 of 19

termination decision.  Plaintiff admitted during the November 4 meeting that she force balanced

the vault rather than re-counting it or expressly reporting the cash difference to her supervisor

before leaving on November 1.  Whether intentional or due to "pregnancy brain," her conduct

was a terminable offense under Bank Policies, and there is no evidence to suggest that Defendant

did not view it as the true reason for that decision.

In sum, Plaintiff cannot point to evidence in the summary judgment record that calls into

question Defendant's proffered reason for its termination decision.  Therefore, summary

judgment is granted on her remaining claim of sex discrimination based on her termination.

Because Plaintiff is unable to meet her summary judgment burden on the discrimination claims

under the *McDonnell Douglas* burden-shifting framework, the Court need not consider

Defendant's alternative basis for summary judgment on its mitigation of damages affirmative

defense.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for Leave

to File Surreply (Doc. 31) is **granted**.  Plaintiff shall file her proposed Surreply forthwith.

**IT IS FURTHER ORDERED BY THE COURT** that Defendant's Motion for

Summary Judgment (Doc. 24) is **granted**.

**IT IS SO ORDERED.**

Dated: June 9, 2022

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE